## THE CITY OF CHICAGO

### *v.*

## THE CHICAGO LEAGUE BALL CLUB.

*Opinion filed April 16, 1902.*

1. MUNICIPAL CORPORATIONS—*a city is but the representative of the State in discharge of certain duties.* Although a city is regarded as a corporation created for its own benefit, still, in the exercise of many of its powers, it is but the representative of the State.

2. MOBS AND RIOTS—*the duty of city to suppress riots is of a public character.* The duty imposed upon cities to suppress and prevent riots, mobs and disorderly assemblages is public or governmental in character, and in the discharge thereof a city acts as a public agency of the State.

3. SAME—*a city has no power to call out militia to suppress riots and mobs.* The legislature has conferred upon cities various powers to aid in discharging the duty of maintaining public tranquility and suppressing disorder, which are sufficient under ordinary circumstances, but the power to call out the military forces of the State is not conferred upon them.

4. SAME—*primary duty of suppressing riots and mobs rests upon the State.* Primarily, the duty of protecting the lives and property of citizens from unlawful violence of mobs and rioters vested in the State, and this duty has not been divested nor in any degree impaired by the delegation of the various powers to municipalities.

5. SAME—*city not liable for expense of militia called in to suppress riot.* When a riot assumes such proportions that it becomes necessary to have the Governor call out the militia the general State government is the actor, and the burden of expense which its acts incur is not to be borne by the city.

6. SAME—*duty of State to suppress riot does not depend upon notification by mayor.* The duty of the State to interfere to suppress mobs and riots does not necessarily depend upon the decision of the mayor of the city or notification by him that a state of lawlessness exists which is beyond the power of the civil authorities to control.

7. SAME—*a city is not liable for rent of camp ground, nor for damage thereto by militia.* Where the State sends the militia to a city to aid in suppressing a riot, the city is not liable for the rent of the property taken as a camp ground, nor for the damage done thereto, even though the property was occupied at the mayor's direction.

*City of Chicago* v. *Chicago League Ball Club,* 97 Ill. App. 637, reversed.

APPEAL from the Branch Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. ABNER SMITH, Judge, presiding.

GRANVILLE W. BROWNING, for appellant:

The State alone is liable, if any liability exists. *Curtis* v. *Allegheny,* 1 Phil. 142; *Rausch* v. *Ward,* 44 Pa. St. 389; *Chapin* v. *Ferry,* 3 Wash. 386; *San Antonio* v. *White,* 57 S. W. Rep. 858; *Worth* v. *County Comrs.* 24 S. E. Rep. 778; *Auditor General* v. *Supervisors,* 64 N. W. Rep. 570; *Prince* v. *McCarthy,* 61 id. 220; *Lahner* v. *Williams,* 84 id. 507.

The mayor of the city, in calling upon the Governor for troops to quell riots, and in any directions he may give them, is acting as the agent of the State and not as a municipal officer, in the same way that a sheriff, exercising the same authority, is not a county officer; and any liability arising from the acts or directions of either is that of the State, and not of the city or county. *Kinnare* v. *Chicago,* 171 Ill. 332; *Robinson* v. *Greenville,* 42 Ohio St. 625; *Craig* v. *Charleston,* 180 Ill. 154; *Chicago* v. *Williams,* 182 id. 135; *Gianfortone* v. *New Orleans,* 61 Fed. Rep. 64; *Cobb* v. *Portland,* 55 Me. 381; *Western Col.* v. *Cleveland,* 12 Ohio St. 375; *Gilboy* v. *Detroit,* 73 N. W. Rep. 128; *Buttrick* v. *Lowell,* 1 Allen, 172; *Maximilian* v. *Mayor,* 62 N. Y. 160.

Neither the mayor of the city nor any of its police officers had any authority to bind the city for any rental

of the grounds in question. *San Antonio* v. *White,* 57 S. W. Rep. 858.

There was no appropriation made by the city council providing for the payment of any such expense as renting camping ground for the militia, even if the city council had such powers, and consequently appellee could in no event recover. Rev. Stat. chap. 24, art. 7, secs. 2, 3.

The taking of the grounds in question by the militia was under the police power of the State, and hence no recovery can be had. *Harman* v. *Lynchburg,* 33 Gratt. 37.

CHARLES M. SHERMAN, and JOHN N. SWARTS, for appellee:

In taking appellee's property the city's officials facilitated the movement of the troops, and thereby saved the city from liability. Starr & Cur. Stat. chap. 24, sec. 27; chap. 38, secs. 399, 400; *Eagan* v. *Chicago,* 5 Ill. App. 70.

The mayor had power to enter into a contract with appellee, which is binding upon appellant, if an emergency existed making it of immediate necessity and if the contract was essential to a proper discharge of his duties as mayor in suppressing disorder and in protecting property. Starr & Cur. Stat. chap. 24, sec. 24; Rev. Code of Chicago, 1897, secs. 2180, 2182; *Barnert* v. *Patterson,* 48 N. J. 395; *Louisville* v. *Murphy,* 86 Ky. 65; *Wiley* v. *Seattle,* 7 Wash. 576; Mechem on Agency, sec. 481; *Greenleaf* v. *Moody,* 13 Allen, 363; *Forrestier* v. *Bordman,* 1 Story, 43; *New York* v. *Buffalo,* 2 Hill, 434; *Chicago League Ball Club* v. *Chicago,* 77 Ill. App. 124.

Appellant having taken appellee's property, is indebted to the latter upon an implied contract. Dillon on Mun. Corp. (3d ed.) secs. 460, 461; *Bridge Co.* v. *Utica,* 17 Fed. Rep. 316; *Allegheny City* v. *McClurkan,* 14 Pa. St. 81; *Rose* v. *Day,* 21 Ill. App. 139; *Wodyatt* v. *Connell,* 38 id. 475; Starr & Cur. Stat. chap. 80, sec. 1; *Oakes* v. *Oakes,* 16 Ill. 106; *Clayburgh* v. *Chicago,* 25 id. 440; *Hadley* v. *Morrison,* 39 id. 392.

Appellant having taken appellee's property for public use, the latter is entitled to recover from the former for its use under section 13 of article 2 of the constitution. *Braceville Coal Co.* v. *People,* 147 Ill. 66; *Elgin* v. *Eaton,* 83 id. 535; *Nevins* v. *Peoria,* 41 id. 502; *Pekin* v. *Brereton,* 67 id. 477; *Aurora* v. *Gillett,* 56 id. 132; *Aurora* v. *Read,* 57 id. 29; *Pekin* v. *Winkle,* 77 id. 56; *Shawneetown* v. *Mason,* 82 id. 337; *Railroad Co.* v. *Chicago,* 166 U. S. 226; Vattell on Law of Nations, book 3, p. 402; *Bishop* v. *Mayor,* 7 Ga. 200; *Mayor* v. *Lord,* 17 Wend. 285; *Railroad Co.* v. *Chicago,* 140 Ill. 309; *United States* v. *Railroad Co.* 120 U. S. 227.

Mr. JUSTICE BOGGS delivered the opinion of the court:

On the 6th day of July, 1894, the mayor of the city of Chicago, acting in virtue of his official authority as such mayor, notified the Governor of the State that the aid of the State militia was necessary to enable the authorities of the city of Chicago to preserve the peace and execute the public laws. The executive detailed five regiments of the State militia to aid the civil authorities of the city in so suppressing violence and enforcing the law. Two of these regiments were ordered from their homes in portions of the State outside of the city of Chicago. By the direction of the mayor these two regiments took possession of the grounds or park of the appellee league ball club, occupied the same as and for an encampment ground, and remained there for a period of twenty days. The possession of the park was taken and the troops encamped therein without the knowledge or consent of the appellee club, the owner thereof. The president of the appellee club without delay called upon the mayor with relation to the matter, and testified that the mayor said the club "would be remunerated—would have payment for the grounds." The appellee club claimed the militiamen, while in possession of the park, dug holes in the base ball diamond; drove horses pulling heavy caissons on and across the bicycle track; broke down or damaged

the turn-stiles, ticket boxes, chairs, benches, etc., belonging to the club, causing injury and damage to the park and to the property of the club in the aggregate sum of $2352.05. The club also demanded as the reasonable rental value of the ball park during the period it was so occupied by the troops the sum of $10,000, and brought this an action of assumpsit against the city to recover the said rental value of the said park and compensation for the injury and damage to its property. On the hearing the circuit court held the city was not liable to answer for the rent or to respond in damage for any injury done to the property of the club. On an appeal to the Appellate Court for the First District, prosecuted by the appellee club, the judgment was reversed and the cause was remanded for further proceedings in conformity with the opinion then handed down by the Appellate Court. (*Chicago League Ball Club* v. *City of Chicago*, 77 Ill. App. 124.) The cause was re-docketed in the circuit court, and upon a trial before the court, a jury having been waived by agreement of the parties, judgment was entered in favor of the appellee club in the sum of $4761. On a second appeal to the said Appellate Court this judgment was affirmed. The city has brought the cause into this court by a further appeal.

The only assignments of error necessary, in the view we have taken of the case, to be considered, are those relating to the action of the court in passing upon certain propositions of law in the case. Such propositions were as follows:

1. "That no liability arose against the defendant by reason of the occupation by the State militia of the premises described in plaintiff's declaration during the month of July, 1894, as testified to in this case, or by reason of any destruction of property by the militia at that time.

5. "That the occupation by the militia of said ball ground was the act of the State, and not of the city, the defendant, and the militia were in no sense the agents

or servants of the city, and their occupation of said ball park in no sense created a liability on the part of the city, nor is the city liable for any act of destruction or waste by the militia.

6. "That the occupation of the ball park by the militia was the act of the State, and not of the city, and the militia, during all said occupation, were under the orders of the State and not of the city, and such occupation, and any waste or destruction suffered on account of the same, created liability on the State only, if upon any one."

The court ruled these propositions did not state correct principles of law applicable to the case. The action of the trial court in ruling on these propositions was in obedience to the views expressed by the Appellate Court in the opinion rendered when the judgment first entered in the circuit court was reversed, but we are unable to accept as correct the principle announced by the Appellate Court.

The People, in their original sovereign capacity, adopted the constitution of 1870 in order, as they declared in the preamble to the organic instrument, "to form a more perfect government, establish justice, insure domestic tranquility, provide for the common defense, promote the general welfare, and secure the blessings of liberty to ourselves and our posterity." The General Assembly, in whom the constitution vested the power to enact all laws for the government of the State, in order the more effectually to secure and maintain the public tranquility and promote the safety of the person and property of the citizen, determined that in the practical administration of the State government it would be wise to invest local State agencies with limited power to exercise governmental functions. Incorporated cities and villages, among others, were selected to act as such governmental agencies within their respective territorial jurisdictions, and were clothed with such powers as the law-making department deemed proper to entrust

to them.   Though a city is regarded as a corporation
created for its own benefit and as having been invested
with corporate life and power by its own desire and at
its invitation, still, in the exercise of many of the powers
conferred upon it by the General Assembly, the city is
but the representative of the general government of the
State.   Cities have powers and duties of two kinds.
The first consists of public or governmental duties and
powers, and the second, of private or proprietary duties
and powers.   Subdivision 72 of article 5 of the City and
Village act confers upon cities the power, and charges
it upon them as a duty, "to prevent and suppress riots,
routs, affrays, noises, disturbances, disorderly assem-
blies in any public or private place."  The duty thus im-
posed upon a city is public or governmental in character,
and in the discharge thereof the municipality acts as a
public agency of the State.   It is the duty of the city
to exercise every power with which it is invested, in the
endeavor to discharge the duty of maintaining the public
tranquility and suppressing disorder.   The General As-
sembly granted to these municipalities various powers, in-
tended to be sufficient, under all ordinary circumstances,
to enable them to discharge the governmental function
of maintaining the peace and making safe both life and
property.   These municipalities have, however, only such
authority as the legislature has deemed it wise to grant
to them, and one instrumentality for the suppression of
riotous and tumultuous outbreaks, the last to be resorted
to and the most powerful and effective, namely, the use of
the organized military forces of the State, is not included
in the grant of powers to them.   In the State alone rests
the power to organize, equip and maintain armed bodies
of militiamen, and the control of such organized forces
is committed to the general government of the State.
Section 14 of article 5 of the constitution of 1870 creates
the Governor the commander in chief of the military
forces of the State, (except when called into the service

of the United States,) and invests him with the sole power to direct the militia to be employed to aid in the execution of the laws of the State.

It is not within the power of the General Assembly to confer upon cities and villages independent or primary power to employ the militia of the State in quelling riots and overcoming tumults, and no enactment of the law-making body of the State indicates it to be the legislative intent these municipalities should be charged with the entire burden of preserving the public peace, and preventing violence and disorder of this character within their respective limits under all and every emergency. Primarily, the duty of protecting the lives and property of the citizen from the unlawful violence of mobs or rioters rested in the State, and this sovereign duty was not divested or in any degree impaired or diminished by the delegation of power to the municipalities of the State, but the obligation of the State to preserve the public peace and tranquility and execute the laws remained in full vigor as an inalienable sovereign prerogative and duty. In recognition of this public and supreme duty the General Assembly enacted the act entitled "An act to secure the peace and good order of society, to quell riots or disturbances, to secure the execution of the laws and to provide for special deputy sheriffs, and for calling out and using the military force of the State for the preservation of the peace and the protection of property," approved June 16, 1887, in force July 1, 1887. (Laws of 1887, p. 239.) Section 7 of the act is as follows: "Whenever there is in any city, town or county a tumult, riot, mob or body of men acting together by force with attempt to commit a felony, or to offer violence to persons or property, or by force or violence to break or resist the laws of the State, or when such tumult, riot or mob is threatened, and the fact is made to appear to the Governor, it shall be his duty to order such military force as he may deem necessary to aid the

civil authorities in suppressing such violence and executing the law."

Section 5 of this act and section 13 of article 2 of the City and Village act confer upon the mayors of the different cities of the State the power to advise or make known to the Governor that the assistance of the State is needed to enable the authorities of the city, acting as representatives of the State, to suppress unlawful violence and execute the law in their respective municipalities, when, in their judgment and discretion, the emergency exists making such aid necessary. When the Governor of the State is, in pursuance of these enactments and in accordance with their requirements, so called upon to aid the civil authorities of the local governmental subdivisions of the State, it becomes his duty to exercise the sovereign powers with which he is invested, to the end that the local agencies of the State shall be provided with the necessary governmental assistance to preserve the public peace and execute the public laws in each of the municipalities. Regiments of militia dispatched at the command of the Governor to the scene of disorder and violence in any county, city or village in the State are contributions of power by the State to aid the local agencies of the State in the governmental duty of protecting the lives and property of the people and maintaining the supremacy of the laws. To the extent the powers with which a city is invested are sufficient to enable it to discharge this duty the expense is that of the city. When a tumult or riot assumes such proportions that it becomes necessary that the sovereign shall interfere and exert the supreme power of the State, to that extent the general State government is the actor, and the burden of expense which its acts incur are not to be borne by the city. It is true, the militia, when thus in a city, are subordinate to the civil authorities; but in this position of supremacy the civil authorities are not in the exercise of their private or proprietary powers,

but are acting as representatives of the State and exercising governmental functions. The authority they may exert over the militia is not supreme, but is limited to the right to direct the specific acts to be performed by the militia. The officer in command of the militia acts independently of the city officials and upon the authority of his office as to the mode and manner of accomplishing the act ordered to be performed, and is required to transmit to the Governor a copy of all orders given him by the civil authorities. (Hurd's Stat. 1899, chap. 129, art. 10, sec. 3, p. 1644.) The troops are to be governed by the code of rules or regulations which have been prepared by the Adjutant General with the approval of the Governor. (Crim. Code, chap. 38, sec. 256o.) The power and authority of commander in chief still rest in the Governor. The troops are at the scene of the disturbances by the authority of the State government, and the mayor of the city, the officers of the militia, the Adjutant General and the commander in chief are conjointly engaged, each in his respective position of rank or superiority, as the agents of the general government of the State, in all matters relating to the control, support and maintenance of the armed force of the State. The powers given to the city have proven inadequate to the exigency and the powers reserved in the State are employed for that reason. The duty of the State to so interfere to suppress tumult, riot and unlawful violence does not necessarily depend upon the decision of the mayor of the city or notification by that officer that a state of lawlessness and violence exists which is beyond the power of the civil authorities to control. Section 1 of said article 10 of the Military and Naval Code (Hurd's Stat. chap. 129, p..1643,) authorizes the Governor to act when the fact exists and in any way is made to appear to him. There is no statute requiring cities and villages to defray any portion of the expenses attendant upon the movements of the militia of the State. There is no statutory provision for the

equipment, maintenance or support of the military forces otherwise than at the expense of the people of the State. The employment of this arm of the State government does not cast upon any local subdivision of the State the expense of the maintenance of the forces, nor are counties, cities or villages answerable for the damages to person or property occasioned by the torts or trespasses of the officers or privates of the militia. It is for the State, in its sovereign capacity, to determine whether compensation will be made out of its treasury. Of that we will not speak. It is sufficient for all the purposes of this decision the burden has not been thrown upon the appellant city.

The State has imposed upon municipalities the liability of making partial restitution for injury or damage occasioned to real or personal property (not in transit) by a mob composed of twelve or more persons. (Crim. Code, chap. 38, sec. 256a.) It is argued the presence and assistance of the militia will likely operate to relieve cities of much of the danger of liability under this statute, and that therefore, upon grounds of abstract justice and right, the cities should be held to be responsible for the expense of sheltering the troops on such occasions. The legal liability of a city or village cannot be predicated alone on the merits or justice of a claim. Statutory power to create the indebtedness or incur the liability must be found. If this were not so, would it not be equally consonant with reason to argue that the legislature imposed only partial liability on cities to respond in damages for injuries or damage to property by mobs, for the reason it had not deemed it proper to clothe such municipalities with all power available for the suppression of the mobs and riotous assemblages?

The judgment of the Appellate Court and that of the circuit court are each reversed, and the cause will not be remanded.                    *Judgment reversed.*