**UNITED STATES v. CLARK et al.**

No. 13676.

District Court, W. D. Missouri, W. D.
June 29, 1937.

Maurice M. Milligan, U. S. Atty., and Randall Wilson, Sam C. Blair, Thomas Costolow, and Richard K. Phelps, Asst. U. S. Attys., all of Kansas City, Mo.

James Daleo, John Cook, and Thomas C. Swanson, all of Kansas City, Mo., for defendants.

OTIS, District Judge.

Defendant Joseph Maher, a man around forty years of age, who appeared at the trial a well-dressed, successful, and seemingly unusually intelligent and strong-willed individual, was the dominating figure in the conspiracy charged in this case, at least he was the dominating figure on the immediate scene. That scene was the polling place of the twenty-eighth precinct of the twelfth ward in Kansas City, and the time was Tuesday, November 3, 1936, the date of the last general election in Missouri. All the defendants were election judges or clerks, excepting Maher and Don Depasco, alias Don Pasqualino. The last named appeared on the scene in the capacity of a thug. He and other unidentified ruffians were used by Maher to drive an honest election judge from the polling place and to strengthen the resolution of the weak kneed among defendants. When they had finished that assignment, Don Depasco asked Maher if he were satisfied and made his exit.

Maher was not an election official. He was described as one of the Democratic precinct captains (the evidence disclosed that there were two Democratic precinct captains in this precinct, one for each local faction of the party, one for the "goats," another for the "rabbits"). When the polls were closed, Maher took charge. The ballots were emptied out of the ballot box on to a table. They were divided into piles. There was one pile of straight Republican ballots. These were handed to Maher and Ogden (a female Republican judge who had twice been sentenced to a penitentiary), standing behind an immediately adjacent counter, and there they, but chiefly Maher, in the very presence of all defendants except Don Depasco, mutilated the ballots by erasing the marks indicating they were intended as Republican ballots and then forged each ballot thus erased so as to make it appear to be a Democratic ballot. In this manner and by other methods a false count was achieved and certified.

The foregoing is a thumbnail sketch of what happened in the polling place of the twenty-eighth precinct of the twelfth ward on November 3d. The proof of the facts

stated was overwhelming. There was not a word of denial either in the testimony, in the argument of counsel to the jury, nor in the argument of counsel in support of the motion for new trial. The infamous facts stand admitted in every conceivable way except by pleas of guilty.

This was the ninth in a series of similar cases, all revealing similar shameful debaucheries of the ballot box, in no one of which has a single individual among those charged been found not guilty by a jury. All the defendants in all the cases (excepting two as to whom there was disagreement) have been found guilty. In all the trials not one of those convicted, when asked before sentence if he had anything to say why he should not be sentenced, has had a word to say in explanation or extenuation of the conclusively proven facts. Not one defendant has had a word to say except the defendant Joseph Maher in this last and present case. When Maher was asked if he had anything to say, he said, "In what I did I had no intention of defrauding any *specific* person."

1. In that short sentence spoken by defendant Maher and in the emphasis he gave the word "specific" when he spoke the sentence is the heart of the chief argument made by learned counsel in support of the motion for new trial. Therein doubtless also will be found the heart of the principal contention which will be made before the learned Circuit Court of Appeals, not only in this case but in each case of this series.

The statute underlying the indictment in this case makes it a crime "If two or more persons conspire to injure * * * any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States." Cr.Code § 19, 18 U.S.C. A. § 51.

The argument made by learned counsel in support of the motion for a new trial is that it was no violation of this statute for Maher and Ogden (we speak of two of the defendants only, to simplify the argument) to conspire to injure scores of citizens in the twenty-eighth precinct, identified in their minds only as citizens intending to and voting Republican ballots and not at all identified in their minds as John Doe, Richard Roe, William Smith, Thomas Brown, etc. And the argument further is that it was no violation of this statute for Maher and Ogden to conspire to injure

citizens not particularly in the free exercise and enjoyment of the right to cast votes for candidates for Congress (conceded to be a right secured to the citizen by the Constitution and laws of the United States) but to injure them in the free exercise and enjoyment of the right to cast votes for *all* Republican candidates, whether for national, state, or local offices.

When in the oral argument of the motion for new trial we asked counsel to clarify his argument by an illustration of what he would concede was a violation of the statute, he promptly complied with the request. Said counsel, the statute would be violated should two or more, actuated by personal malice toward John Doe, having him identified as an individual in their minds, and intending to injure him as an individual and on his individual account, should they, so actuated and with that intent, conspire to prevent John Doe from voting for his choice for the office of representative in Congress.

Now it must be said that the illustration undoubtedly does present a case within the meaning of the statute. We think also that it must be said (of course we cannot and do not pretend to hold the government to our views) that, if the illustration indicates the outside boundary line of the intent and purpose of the statute, then it was error to submit this case to the consideration of the jury. We have no doubt at all that the defendants did not particularly conspire to nor intend to injure John Doe or any other identified in their minds as an individual. We have no doubt at all that defendants were not actuated by hatred, malice, or ill will toward John Doe or any other as an individual. We have no doubt at all that the ultimate object and purpose of defendants was not particularly to injure John Doe or any other identified individual in the free exercise and enjoyment of his right to vote for a candidate for Congress. The ultimate object and purpose of the defendants and of their conspiracy was to steal the election for all candidates on the Democratic ticket, whether they were candidates for national, state, or local offices. We have no doubt as to these conclusions. But we are convinced beyond the slightest question that the federal statute is not so worthless as not to include within its meaning such a conspiracy as was proved here.

The background and immediate purpose of the statute are well known. Rights, including the right to vote, had been secured

to the recently emancipated negro slaves by amendments to the Constitution. This statute was designed to protect, primarily, negro citizens in the free exercise and enjoyment of those rights. Obviously (it seems obvious to us) Congress wished to protect and secure the rights which Congress had in effect conferred. That which was sought to be protected was *rights,* rather than individuals as individuals. If the protection was limited to rights secured by the Constitution and laws of the United States, that was because the authority of Congress went no further. Is it possible that Congress did not intend that within the conspiracies denounced by the statute should be included such a conspiracy, for example, as a conspiracy of two or more to injure *all* of the negro citizens of a given precinct by counting none of their votes for congressman *and* for *all* other candidates and to accomplish the end aimed at by tearing up *all* of their ballots before the count? Was such a conspiracy excluded from the intent of the statute and only such conspiracies included as, for example, a conspiracy of two or more to injure X, a particular negro, because the conspirators had malice against X, a conspiracy to injure him by making ineffective his vote only for his candidate for Congress? So narrow a construction of the statute as the last suggested seems to us to be inconsistent with the words used in, and the object sought to be accomplished by, the statute.

Consider this statute element by element in connection with the proven facts: (1) The thing sought to be prevented by the statute is injury to citizens in the free exercise or enjoyment of rights or privileges secured by the constitution and the laws. The showing in this case is that citizens were injured in the free exercise and enjoyment of rights and privileges secured to them by the Constitution and laws (and not less so because also they were injured as to rights and privileges secured to them by the Constitution and laws of the state). (2) The object of the statute was to be accomplished, not by making the injury of citizens in the respects indicated a substantive offense, but by providing for the punishment of those who should agree together so to injure citizens. The showing in this case is that the defendants did agree together to injure citizens in the respects mentioned in the statute (and also to injure them by preventing the free exercise and enjoyment on their part of rights and privi-

leges secured to them by the Constitution and laws of the state). In other words, the two principal elements of the statute are fully exemplified in the facts proved in this case.

If the statute made it an offense for any person "to injure * * * any citizen in the free exercise and enjoyment of any privilege secured him by the constitution or laws of the United States" and the proof showed, as the proof does show here, that the defendants had injured citizens in the free exercise and enjoyment of the right and privilege of voting for a member of Congress (being a right and a privilege secured by the Constitution and laws of the United States), would it be argued that they were not guilty of crime if it were proved that, while they *intentionally* injured citizens, they were motivated, not by malice toward the citizens injured, but by a desire to defeat the candidates for whom the citizens intended to and did cast their votes. That could no more be argued than it could be argued that the law prohibiting an assault upon a citizen is not violated if the purpose of the assault is not physically to injure the citizen (although that is done) but to steal his watch for the value of the watch. If, however, the substantive offense denounced in the supposed statute would have been committed by the defendants in doing what has been proved against them, certainly a violation of this statute has been proved when it has been proved that they agreed together to commit what would have been a violation of the supposed statute.

Again let us suppose that we have a statute reading, "If two or more persons conspire to injure any citizen in the free use and enjoyment of any personal property belonging to him they shall be guilty of a felony."

It is proved that A and B agree together that they will hold up a train running on a certain railroad at a certain time and will rob every passenger in that train of his money and his jewelry. That agreement they carry out and they do rob every passenger in the train in question of the money and jewelry he has upon his person. They are indicted for the offense of conspiracy denounced in the statute. To us it is inconceivable that upon their trial the judge would direct a verdict of "not guilty" because the defendants, when they agreed together, did not have any particular individual or particular individuals in mind,

984

or, because they had no ill will towards any particular individual or individuals or because (although they knew what they planned would injure individuals), they were not primarily intent on injuring individuals but only on acquiring for themselves the property of others. Necessarily involved in the agreement of the defendants is the conception of injury to individuals. Necessarily involved in their agreement is the conception of injuring individuals in the enjoyment by them of their personal property. It seems to us that the hypothetical case is parallel with the case before us.

When the defendants agreed together that they would destroy a ballot which has just been cast by a Republican citizen and voter (all of which they certainly did agree to do and did do), did they not agree to injure that citizen in his right to vote for the candidate for Congress whose name appeared on that ballot? Suppose he had but just before the defendants destroyed his ballot handed it to the defendants and was still standing in their presence when they agreed to and did tear it into bits. Would they have been less guilty of the conspiracy denounced by the statute because they did not know his name, or because they did not hate him but only were against his candidate? The injury to the citizen and the agreement to injure him are not one whit less present because the end sought to be attained through his injury is something other than his injury. How is the situation altered if the citizen has gone before his ballot is destroyed and the injury effected? And, if the ballots of citizen after citizen are torn to bits (or destroyed by erasures) by the defendants, and that at the close of the day when all the citizens have gone from the polls, how is the situation altered in its essence from the simpler situation first described?

■ 2. The point was scarcely touched in the argument of the motion for new trial but several times made in the course of the trial that, since no citizen's ballot was tampered with *before* the polls closed (the evidence was that the ballot of every citizen was deposited in the ballot box just as it was made out by him), therefore there could be no violation of the statute upon which rests the indictment. As counsel put the matter in objections made, the citizen had fully exercised his right to vote when his ballot was deposited in the box. To us the point seems altogether without merit.

Perhaps we have wholly failed to grasp the real significance of the point, although we have endeavored to do so. Counsel did not see fit to elaborate it. To say that a citizen has not been injured in the free exercise and *enjoyment* of his right to vote for a candidate for Congress because his ballot is destroyed *after* rather than *before* it is deposited in the ballot box seems to us an absurdity. We fear we must have failed to understand the real meaning of counsel.

■ 3. It was contended in the argument of the motion for new trial that error prejudicial to the defendants was committed when the one honest election judge at this polling place was permitted to testify as to what happened to him after he was driven from the polls by the defendants. (Actually he had been driven from the polls by one of the defendants at the instance of another and in the presence of all.) He had been driven from the polls by violence and threats of violence. Immediately after he left the polling place he attempted to telephone to the Board of Election Commissioners, but was prevented from doing that, being surrounded by persons whose conduct was threatening. He was again similarly subjected to intimidation before he reached his home. These events, subsequent to the expulsion of this judge from the polling place, so closely were connected in point of time and in character with what transpired while he was still at the polling place that it seems to us the testimony was entirely competent. Certainly it could not be prejudicial to the defendants, who drove the honest judge from the polling place by threats and by violence, that thereafter others, by milder methods, continued the course of intimidation they had inaugurated.

■ 4. One other point was urged upon us in the oral argument supporting the motion for new trial. The contention is (a like contention has been made in every one of the cases in this series of cases) that it was error to permit grand jurors who had examined and counted the ballots cast in this precinct to testify as to the result of their count. We perceive no merit in this contention. The record clearly will show that testimony in this case (and in every case in this series) was received with the understanding, always complied with fully, that the ballots and election paraphernalia which were before the grand jury would be offered in evidence, that defendants would

be given full opportunity to examine all such exhibits and to call any witness who, for them, had made a count. The ballots were offered. They are in the record. The jury saw them and studied them. A recess of court was had to give defendants full opportunity to study the ballots and to enable witnesses for defendants to prepare to testify touching the ballots. An expert witness testified for the government on the same subject. He was fully cross-examined. Neither in the testimony of any witness nor in the argument to the jury of any of three learned counsel for defendants was the slightest question made as to the essential matters in the now challenged testimony. To say now that that testimony was prejudicial is indeed to exemplify those "gossamer possibilities of prejudice" of which Mr. Justice Cardozo spoke so emphatically not long ago.

5. What remains of this short opinion is not written because of anything that was said in the oral argument of the motion for new trial. We have been led to write it from having just now seen a copy of a brief in the Court of Appeals in a companion case to this (the first in this series to be tried).

While learned counsel in this case, whom we esteem so highly, at the close of the trial and in the presence of the jury expressed their appreciation of the fairness with which the trial had been conducted (and we are grateful for that), with sorrow we discover that before the Court of Appeals we are charged with having presided at other trials in this series (and all were tried in the same manner) with unfairness, with tyranny, with oppression, with partiality. It is proper to refer to that matter in this connection since the cases all are but separate episodes in the same litigation. Indeed, the defendants in the several cases are represented by counsel selected by a single citizen (not by the defendants).[1] The cases are to be presented to the Court of Appeals by the

---

[1] The Grand Jury's Report.

Following is the text of the open report the federal grand jury submitted late yesterday to Judge Merrill E. Otis in connection with the financial and legal support given vote fraud conspiracy defendants by Thomas J. Pendergast and James M. Pendergast:

We, the grand jury, constituted to serve during the April, 1937, term of this court, being about to recess for a period of two months, and having been charged to investigate the matters of the employment of attorneys in the so-called election fraud cases, the procurement of bonds and the payment of costs and expenses in those cases, herewith submit the following reports:

1. We have ascertained that the attorneys who represent the defendants in the so-called election fraud cases already tried, except in the cases of a few defendants who pleaded nolo contendere, have in no case been employed or retained by the defendants themselves or solicited by the defendants to represent them.

2. The attorneys who have represented the defendants were directed or solicited to represent them by one James M. Pendergast, who stated to the attorneys that the reason for his interest was the distress he felt because of the predicament of the defendants, Republicans as well as Democrats, and their probable inability to employ attorneys for themselves.

3. The attorneys who have represented the defendants testified that they have not been directly compensated for their services and that they do not expect to be compensated for their services directly.

4. Surety bonds for the appearance of defendants at their trials, generally speaking, and also in some instances their appeal bonds, have been made by the Central Surety and Insurance corporation as surety. The principal amount of the bonds so made to date is $302,500. The commissions paid for these bonds amount to $3,648.75, not including a balance due and unpaid. To secure the surety company there has been deposited with the company in cash a total of $75,000.

5. The premiums which have been paid to the surety company for these bonds have been paid entirely by James M. Pendergast, except that 30 per cent of the customary premium for such bonds has not been paid, owing to the fact that Thomas H. McGee & Sons, agent for the surety company, does not collect this 30 per cent which amounts to its commission on the premiums, but donates it to James M. Pendergast. Of the $75,000 deposited with the surety company, $15,000 was deposited by one William Boyle, and $60,000, in $100 and $1,000 bills, by James M. Pendergast. It was represented to the agent of the surety company by James M. Pendergast that in paying premiums and in putting up $60,000 as security he was actuated solely by his sympathy for the defendants in their distress.

6. More than $9,000 has been advanced in cash to take care of trial expenses for defendants to this date. This amount was

same attorneys. What is called a "master brief" covering all the cases already has been filed in the Court of Appeals, to be supplemented by separate briefs for defendants in the several cases, including the case now before us.

Of course we do not say that we may not have erred in rulings on questions of law involved in this and companion cases. It is entirely possible that we have erred. Every ruling made, however, has been made after painstaking consideration. Every important ruling has been accompanied by a written opinion or by reference to an opinion written concerning the same question in an earlier case in the series. Some of these opinions already have been published. Others of them will be published. Even in connection with the rulings made on the admission and exclusion of testimony in this and other cases we have taken care to state the reasons for our rulings.

It is entirely possible that we have erred in rulings on questions of law. We did not think, however, that learned counsel in any of these cases (and we feel sure it will not be true as to learned counsel in this case) would impugn our integrity and accuse us of partiality and tyranny. We have been careful in every case publicly, to the jury, in written opinions, in connection with rulings on various motions, over and over again, to attest our high regard for all of counsel for defendants, our admiration for the manner in which they had played their parts, and for their adherence to the highest principles of the code of ethics. The tributes were sincere. Yet we see in the brief to which reference has just been made that on one occasion, after the particular trial had ended, at the imposition of sentences, we "commended the United States Attorney" and "lauded Judge Reeves." That, however, was after we had just as emphatically commended and praised attorneys for defendants (as to which in the brief no reference is made).

We see in this brief that "defendants were rushed into trial without opportunity to know whether their case or some other case would go to trial, and without adequate opportunity to them or their counsel to prepare their defence." We see in this brief that "heavy and increasingly heavy sentences were imposed as the trials progressed on men and women, fathers and mothers." We see in this brief over and over again expressed or clearly intimated charges of oppression, partiality, passion, and prejudice on the part of the judges of the District Court.

We must leave our defense as to these matters to the written transcripts of the records, although we had hoped that every one of the attorneys on both sides in all the cases not only would not make, but would defend us against, such charges.

As we have said already, our rulings as to law never have been arbitrarily given but always with a full statement of reasons. No application made by any defendant in any of the cases for further time for preparation for trial has been denied. Long notice has been given as to when trials would be had. Much more than the usual information has been given as to the order in which the cases would be tried. Every request for a recess during a trial has been granted. The clerk has been directed in connection with each prospective trial to provide counsel for defendants with jury lists immediately upon drawing. Counsel have been advised by the judge as to excuses from the panel so that their investigation of jurors would be facilitated. Whenever, in an application to be excused from jury service, if the application has been refused, the prospective juror has given some reason that might be of interest to counsel on either side, counsel on either side, including counsel for defend-

---

advanced by James M. Pendergast. It was explained to us that in contributing this sum Mr. Pendergast was actuated solely by sympathy for defendants in their distress.

7. Thomas H. McGee & Sons, the agent of the surety company, has been assured by one Thomas J. Pendergast that he will advance any further amounts necessary to secure the surety company in addition to the amounts already advanced by James M. Pendergast for this purpose.

In keeping with your charge to the grand jury, when we reconvene on September 7, 1937, we, the grand jury, have sufficient information to warrant a continuance with renewed interest our investigation pertaining to matters relative to furnishing funds to secure the bonds in all election fraud cases, and the financing of the cost to carry on the defense of all such cases.

[Signed]  Roy Bretz,
Foreman, Grand Jury.

ants, have been advised of that fact. Upon the voir dire examinations every challenge by defendants' counsel has been immediately granted, even when it was insufficiently supported by the facts. In the whole series of trials there have not been more than two or three night sessions, although it has been our practice for twelve years to hold night sessions, particularly when a jury is impounded and when the long duration of a trial is likely to result in a mistrial through the illness or incapacity of jurors. Yet we are charged, as if we, like the tribunals of the French Revolution, had been intent on hurrying defendants to their doom, charged with having held "sessions of court * * * day and night."

We have endeavored in all these cases (and we know that our colleague has endeavored) to try them fairly as to the parties, with kindness and charity toward the accused, with respect and courtesy for counsel.

The very last words in this brief which we now lay aside forever are a reference to the days of "the Ku-Klux Klan." What an unfortunate reference that is! We say so as from this point we look back on the revelations these trials have made. The statute behind these cases, it is true, had its origin in the determination of the sovereign to protect the humblest citizens, poor, helpless negroes, to protect them in their constitutional rights from the oppression and abuse of the Ku Klux Klan. Now citizens, not negroes only, men and women of all races, of all walks in life, of all social ranks, lift up their hands here in Kansas City appealingly to the same sovereign for protection in the same constitutional rights from the fraud and violence, not, it is true, of the Ku Klux Klan, but of powers and conspirators just as completely sinister, barbaric, un-American. Happily, and again we speak as one looking backward from this point, when our own work is done, happily they have not appealed in vain to the sovereign's executive, so ably represented here by United States Attorney Milligan, not acting, we are very certain, without the earnest approval and determined co-operation of the Attorney General of the United States and of the Chief Magistrate himself.

We think the defendants in this case have had a fair trial and that there is no good reason for sustaining the motion for new trial.

Maurice M. Milligan, U. S. Atty., and Randall Wilson, Sam C. Blair, and Thomas Costolow, Asst. U. S. Attys., all of Kansas City, Mo.

James J. McNamara, of Kansas City, Mo., for defendants Murphy, Slattery, and others.