## UNITED STATES v. KONOVSKY.

## UNITED STATES v. BRANI et al.

### Nos. 10672, 10673.

United States Court of Appeals
Seventh Circuit.

March 9, 1953.

John D. Knodell, Jr., and Floyd E. Thompson, Chicago, Ill. (Johnston, Thompson, Raymond & Mayer, Chicago, Ill., of counsel), for appellant.

Otto Kerner, Jr., U. S. Atty., Chicago; Ill. Leo F. Tierney, Chicago, Ill., Charles B. Murray, Asst. Atty. Gen., Henry Putzel, Jr., James X. Kilbridge, Attys., Department of Justice, Washington, D. C., for United States.

Before MAJOR, Chief Judge, and DUFFY and LINDLEY, Circuit Judges.

LINDLEY, Circuit Judge.

Erwin Konovsky, Superintendent of Police of the Town of Cicero, on December 13, 1951, was charged in Count 1 of two counts of an indictment with having conspired with certain named other persons and still others said to be "unknown to the grand jurors", in violation of 18 U.S.C. § 371, to commit an offense against the United States, namely, to deprive, in violation of 18 U.S.C. § 242, Negro inhabitants of certain rights, privileges and immunities secured to them by the Constitution and laws of the United States. In Count 2 Konovsky and Brani and Lange, police officers, were charged with a substantive violation of Section 242. The jury found Konovsky guilty upon both counts, and Brani and Lange guilty upon Count 2. Each was sentenced to pay a fine and costs. From these judgments, the three defendants have prosecuted their appeals.

In view of our disposition of the issues presented, we deem it unnecessary to narrate in detail the voluminous evidence introduced in the trial of a cause which reflected grave factual questions concerning alleged racial discrimination and disgraceful rioting on the part of private persons, but shall content ourselves with the observation that, after careful consideration, the evidence, considered by us, as it must be, in the light most favorable to the Government, was in the absence of procedural error, adequate to sustain the verdicts.

Defendants zealously insist that the trial court erred in denying their motion to dismiss the indictment. Specifically and essentially Count 1 charged Konovsky, three other named defendants, with whom we are not now concerned, and certain other named conspirators who were not made defendants, with having conspired to commit an offense against the United States, that is to say, that in the conspiracy, they, while acting under the color of laws statutes, ordinances and regulations in force in the Town of Cicero, Illinois, intended "willfully and knowingly" to subject and cause to be subjected "any Negro inhabitant of the United States who might then or thereafter seek to lease to or from any person, or to occupy, hold, possess, own or enjoy access to any real property in the said Town of Cicero, and in particular the premises in the said town known as 6139 West 19th Street, to the deprivation of the rights (1) not to be deprived of liberty or property without due process of law, (2) not to be denied the equal protection of the laws * * *, and (3) the right to lease real property to or from any person, and the right to occupy, hold, possess, own or enjoy access to real property free from restraint or hindrance imposed by anyone acting under color of law, otherwise than as provided by law * * * and, while acting under color of law as aforesaid, together with the alleged co-conspirators * * * named, and divers * * * other persons whose identities were to the Grand Jurors unknown", * * * willfully to "prevent, hinder, impede and restrain any Negro inhabitant of the United States who might then or thereafter seek to lease to or from any person, or to occupy, hold, possess, own or enjoy access to any real property in the Town of Cicero and in particular the premises in the said Town known as 6139 West 19th Street, from doing so, all for the purpose and with the intent of depriving any such Negro inhabitant of the constitutional rights aforesaid." This count, argues defendant Konovsky, did not charge a crime, or sufficiently inform him of the charge against him, so as to enable him to prepare a defense or to plead former jeopardy in the event of a subsequent prosecution. Defendant expressly disclaims any contention that the person "whose rights are the object of the conspiracy must be named in the indictment" or "that it is not a crime to conspire against the existing rights held by a defined class or group of persons", but urges that

the right deprivation of which is forbidden under Section 242 must be the right of some identified or identifiable inhabitant and not the right of some "conjectural" or possible inhabitant not identified in the indictment.

■ Of course a charge that parties have conspired in violation of Section 371 must include a showing that the object of the conspiracy is to commit an offense under the laws of the United States. United States v. Britton, 108 U.S. 199, 205–207, 2 S.Ct. 531, 27 L.Ed. 698; Brown v. United States, 5 Cir., 21 F.2d 827, 828; United States v. Eisenminger, D.C.Del., 16 F.2d 816, 818. So in the present case, Count 1, in order to be valid must charge a conspiracy to commit a defined offense. This it attempted to do in the language above quoted. Consequently the question in this respect is whether, in view of defendant's concession that the person whose rights are the object of the conspiracy need not be named in the indictment and that the crime may be committed by conspiring against the existing rights of a defined class, the language of the indictment defines a class or group of persons sufficiently.

■ The conspiracy count charges that the object of the alleged conspirators was to subject or cause to be subjected "any Negro inhabitant" of the United States who might then or thereafter seek to lease, occupy, possess, or enjoy access to any property in the Town of Cicero, and particularly 6139 West 19th Street to deprivation of any right to do so. To our mind, this language means essentially just the same as if the indictment had charged that the alleged participants conspired to subject all Negro inhabitants of the United States who seek to lease, occupy, possess or enjoy access to property in Cicero, and particularly, the specific premises mentioned, to deprivation of the rights enumerated. Paraphrasing still further, we think a fair construction of Count 1 is that the parties named are charged therein with conspiring, under color of law, intentionally and willfully, to deprive all Negro inhabitants of the United States of the constitutional right to have, own or enjoy any property in Cicero and to restrain all such inhabitants from leasing, owning or enjoying any property in Cicero and in particular the premises at 6139 West 19th Street.

Stripped of all excessive verbiage, this is the essence of the count and, thus considered, we think it defines sufficiently the class or group of persons who are to suffer the deprivation charged and amounts to a charge of conspiring to commit an offense against the United States, namely, to violate 18 U.S.C. § 242. These are direct averments that the conspirators planned to prevent any Negro from living or enjoying property in Cicero. Examples of the validity of an indictment charging conspiracy against similarly defined classes are to be found in United States v. Stone, D.C. Md., 188 F. 836; Culp v. United States, 8 Cir., 131 F.2d 93 and United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368. Analogous cases, having to do with the protection of civil rights under Section 241, include United States v. Saylor, 322 U.S. 385, 64 S.Ct. 1101, 88 L.Ed. 1341; United States v. Pleva, 2 Cir., 66 F.2d 529; United States v. Clark, D.C.W.D. Mo., 19 F.Supp. 981; Crolich v. United States, 5 Cir., 196 F.2d 879, certiorari denied 344 U.S. 830, 73 S.Ct. 36.

■ In Count 2 all three defendants were charged with the violation of Section 242 in that, under color of law, they willfully subjected and caused to be subjected one Harvey Evans Clark, Jr., a Negro inhabitant of the State of Illinois, and a lessee of Apartment 5–C in the premises known as 6139 West 19th Street in Cicero, to the deprivation of the following rights secured to him and protected by the Constitution of the United States, namely, "the rights (1) not to be deprived of liberty or property without due process of law and (2) not to be denied the equal protection of the laws, which rights include the right to lease real property from another and the right to occupy, hold, possess and enjoy access to real property free from restraints or hindrances imposed by anyone acting under color of law, otherwise than as provided by law; that is to say, at the time and within the jurisdiction

aforesaid, the said defendants did by force and threats of force, and with the purpose and intent of depriving him of the aforesaid constitutional rights, prevent the said Harvey Evans Clark, Jr., from entering, occupying as tenant and having peaceful possession and access to Apartment 5–C in the premises known as 6139 West 19th Street in the said Town of Cicero, Illinois." This count defendants urge "is deficient in that it does not allege essential elements of the crime"; in that certain averments are mere legal conclusions; in that the count fails to inform the defendants of what statute or ordinance they are charged with having acted under, so that defendants are left "completely in the dark as to the capacity in which they are alleged to have been acting and as to the source of authority they are alleged to have been exercising." Thus is is argued that there is no positive averment that Clark had a lease on or any right to enter any apartment. We think the criticism is over-meticulous. The count seems to us to charge directly a violation of the express terms of Section 242, reading as follows: "Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined not more than $1,000 or imprisoned not more than one year, or both." In substance, the second count, stripped of all superfluity, charges that defendants under color of law "willfully subjected" an inhabitant of the State of Illinois, namely, Clark, lessee of the apartment, to the deprivation of his right to enjoy the property. This is within the terms of the statute. If the defendants had any ground for insistence that they should be more specifically advised as to the facts charged, they had adequate remedy by way of a motion for a bill of particulars. We conclude that each of the counts was sufficient and that the motion to dismiss was properly denied.

■■■■ Over defendants' objections the Government introduced in evidence an order for a temporary injunction entered by the District Court in a civil suit against Konovsky and certain other persons alleged to have been acting in concert with him, not including, however, defendants Brani and Lange, dated 'June 26, 1951, almost three weeks after June 8, which the indictment charges as the time of the commission of the substantive offense. This order was entered in what may be termed a summary hearing upon the complaint and various affidavits. In it the defendants named in that suit were enjoined from interfering with Clark's right to enter the premises. The Government asserts that the order was admissible, not as proof of violation of the law by defendants on June 8 but, as a circumstance in the light of which the conduct of the defendants should be "evaluated," and the court so instructed the jury. The Government's justifying argument that the decree was relevant goes about as follows: It was "implicit" in its theory of the case that a police detail, which, on March 31, had been posted at the apartment building, had been placed there for the purpose of intimidating would-be Negro renters and preventing them from occupying the apartment, while defendants' theory was that the detail had been posted for the purpose of protecting the property, its inhabitants and the Negroes, themselves. The Government argues that, in this situation, the fact that, after the preliminary injunction decree was entered, and presumably in compliance therewith, the police detail was withdrawn, was evidence that the detail originally had been assigned to the apartment building only for the purpose of preventing Negroes from occupying the apartment, and that the withdrawal of the detail after the injunction issued was in the nature of an admission by defendants that such was the case. We fail to appreciate the logic of the Government's rather involved argument. The adjudication of a fact in a civil proceed-

ings, in view of the difference of degree of proof in criminal and civil cases, can afford no basis for the doctrine of *res judicata*, when offered in a criminal cause, Helvering v. Mitchell, 303 U.S. 391, 397, 58 S.Ct. 630, 82 L.Ed. 917, and, though the jury was instructed that the decree was not received as evidence of guilt we know from common experience that a jury would probably be inclined to follow the court's finding against the defendants in the civil action and thus prejudice the criminal trial. Defendants' constitutional right to meet the witnesses face to face was taken from them. We see no escape from the conclusion that the inevitable effect of the introduction of the civil judgment in evidence was to lead the jury in the trial of this criminal case to believe that the same issues had already been determined in the civil action. In our opinion nothing could be more prejudicial to a fair trial. See Hodges v. State, Okl.Cr.App., 222 P.2d 386. What we have said in this respect is applicable to all defendants. Error is even more clearly apparent as to defendants Brani and Lange. They were not even parties to the civil suit.

■ It is said that the defendants waived their objection in this respect. We do not understand that the mere fact that defendants attempted to meet the erroneous evidence constituted waiver upon their part. As said in Salt Lake City v. Smith, 9 Cir., 104 F. 457, 471: "One who objects and excepts to an erroneous ruling which permits his opponent to present improper evidence does not waive or lose his objection or exception, or his right to a new trial on account of it, by his subsequent introduction of the same class of evidence in support of his case." See also Chicago City R. Co. v. Uhter, 212 Ill. 174, 180, 72 N.E. 195, 197; State v. Beckner, 194 Mo. 281, 91 S.W. 892, 896, 3 L.R.A.,N.S., 535; and State v. Kile, 29 N.M. 55, 218 P. 347, 351. Furthermore, even if defendants had waived the objection, we think it would be our duty under Rule 52(b) of the Rules of Criminal Procedure, 18 U.S.C., to notice the error ourselves.

■ During the course of the trial, one Hartsough, a citizen of Berwyn, living a short distance from the location of the apartment in question, testified, extensively as to events which he claimed to have observed at the time of the "riot", on the evening of July 11. In the course of his testimony he mentioned having a conversation with an unidentified man. The witness labeled this person as a police officer but admitted that he had no knowledge of whether the man was in fact a police officer or that he knew what the individual's name was. Nevertheless he was permitted to testify that this person said: "Our chief has warned these niggers to stay out of here". This testimony was objected to and the motion to exclude denied. There was no proof whatsoever of any connection between this stranger and any of the defendants at the time of the alleged conversation or at the time, a month before, when, it is averred, the crime charged in Count 2 was committed. We fail to find in the record any circumstance, any testimony, any evidence of any character to justify the introduction in evidence of such hear-say evidence, quoting a purported vicious, highly prejudicial statement of an unidentified man. To be admissible against others than the declarant, the declaration must not only be made while the conspiracy is pending but must also be in furtherance of its object, and by some one embraced within it. Logan v. United States, 144 U.S. 263, 309, 12 S. Ct. 617, 36 L.Ed. 429; Brown v. United States, 150 U.S. 93, 98, 14 S.Ct. 37, 37 L.Ed. 1010; Tofanelli v. United States, 9 Cir., 28 F.2d 581, 582; Holt v. United States, 10 Cir., 94 F.2d 90, 93. In Krulewitch v. United States, 336 U.S. 440, 69 S. Ct. 716, 93 L.Ed. 790, the court held that a hear-say declaration attributed to a co-conspirator was inadmissible on the ground that it was not made in furtherance of the conspiracy and that its admission could not be considered harmless error. Thus 336 U.S. at page 442, 69 S.Ct. at page 718, it said: "It was made in petitioner's absence and the Government made no effort whatever to show that it was

made with his authority. The testimony thus stands as an unsworn, out-of-court declaration of petitioner's guilt." So, in Allen v. United States, 7 Cir., 4 F.2d 688, a conspiracy case arising during the prohibition era, where a witness testified to an alleged statement of an unidentified woman behind a bar incriminating some of the defendants, Judge Evans, speaking for the majority, referred to the fact that the defendant's objection was withdrawn. He further commented that in view of the fact that there was evidence sufficient to justify the jury in finding that the woman was a co-conspirator, the testimony was admissible as a declaration of a conspirator, having been made while the conspiracy was in force and otherwise pertinent. The intimation is clear that had there been no showing that the woman was a member of the conspiracy, the declaration would have been inadmissible. Judge Alschuler did not agree that there was evidence to show that she was a member of the conspiracy and thought that, therefore, the testimony was inadmissible. He said "I feel constrained to say that in my opinion the testimony of Harold Cross as to the conversation at the 'Green Mountain Inn' ought not to have been admitted, or, having been admitted, should have been excluded, when (as I believe was the case) the evidence failed to connect with the alleged conspiracy to violate the National Prohibition Act the unidentified woman with whom Cross had the conversation to which he testified."

The Government insists that the statement was part of the res gestae and, therefore, admissible. We do not understand the law to be that statements of unidentified persons not shown to have any connection whatsoever with a conspiracy are in any sense of the word part of the res gestae. The admission of this testimony was prejudicial error.

Defendants complain of alleged wrongful reception of hear-say evidence in three other instances. At one stage of the trial, a witness testified that Lt. Johnson of the Sheriff's police, none of whom was charged with being a member of the conspiracy, told him, in Lt. Con-

nerty's presence, that the latter would not endanger his men by sending them into the crowd. No defendant was present. The statement was not connected or claimed to be made by anyone connected with the alleged conspiracy. In another instance, Mrs. Clark, one of the lessees of the apartment, testified that the same Lt. Johnson advised her and her husband not to return to the building "that night" and to contact their attorney the following day. The implications of these remarks, of course, were prejudicial to Konovsky. Johnson was not called as a witness, but what he is supposed to have said was related by others. The quotations were completely hear-say. We know of no rule under which defendants can be held accountable for reputed declarations of one in no way connected with any of them. Indeed, if Lt. Johnson had been called as a witness, his opinion and advice, obviously, would have been inadmissible. More unwarranted was its reception in hear-say form. At another time, the court permitted the Clarks to testify that Edwards and Chandler, real estate agents, had told them the two men had authority to lease the apartment, and received in evidence alleged receipts given by them to the Clarks for a month's rent and for commission. Obviously the declaration of either Edwards or Chandler that they had authority to rent the apartment was inadmissible. Yet the question of whether they had authority to rent the premises was important in determining whether the Clarks had any right to enter the apartment. The authority of the agent may never be proved by his own ex parte declaration. See Nichols v. Republic Iron & Steel Co., 5 Cir., 89 F.2d 927; Brownell v. Tidewater Associated Oil Co., 1 Cir., 121 F.2d 239. Upon each of these three occasions the court improperly received the evidence of hearsay statements made by persons in no wise connected with the conspiracy.

We must remember that Count 1 charges a conspiracy, dubbed by Mr. Justice Jackson as an "elastic, sprawling and pervasive offense". See Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790. His further comment 336

U.S. at page 453, 69 S.Ct. at page 723, is instructive: "When the trial starts, the accused feels the full impact of the conspiracy strategy. Strictly, the prosecution should first establish prima facie the conspiracy and identify the conspirators, after which evidence of acts and declarations of each in the course of its execution are admissible against all. * * * the order of proof of so sprawling a charge is difficult for a judge to control. As a practical matter, the accused often is confronted with a hodgepodge of acts and statements by others which he may never have authorized or intended or even known about, but which help to persuade the jury of existence of the conspiracy itself. * * * The naive assumption that prejudicial effects can be overcome by instructions to the jury, cf. Blumenthal v. United States, 332 U.S. 539, 559, 68 S.Ct. 248, 257 [92 L. Ed. 154], all practicing lawyers know to be unmitigated fiction. See Skidmore v. Baltimore & Ohio R. Co., 2 Cir., 167 F.2d 54."

■■■■ Defendants complain of the refusal to receive certain evidence. One document offered was a leaflet of communistic character distributed long after the essential elements of the charge had come to pass and after the riots had occurred. To our minds this was foreign to and not material or relevant to any issue involved in this case. It is urged also that excluded testimony as to the fair market value of the building would have thrown some light upon the controverted question of whether the threat of Negro occupancy was being used a club over the local citizenry in order to force purchase of the property at an excessive price. However, it is apparent, we think, that no evidence concerning the reason why the apartment was rented to Clark could have any bearing on his right to occupancy.

■■■■ Defendants complain of reception of evidence of what occurred during the assembling of a mob and subsequent rioting on July 10, 11 and 12 at the apartment building, including pictures of destruction of or damage to personal property contained in the building and substantial injury to certain portions of the premises, itself. The Government does not contend that these acts of vandalism were committed by any of the defendants; it is clear that they were the acts of some of the several hundred members of the public congregated in the mob. Count 1 charged a conspiracy to deprive Negro inhabitants of the right to occupy property in the Town of Cicero. Among the overt acts it was charged that defendant Konovsky on July 10, 11 and 12 willfully failed to disperse the mob. It was the Government's theory that this evidence of what the rioters did tended to prove that defendant willfully failed to disperse the mobs and was, therefore, evidence bearing upon the charge of conspiracy to deprive Negro inhabitants of the right to enter. Under this theory we think evidence of what occurred at the time of the riots was properly received in an effort to discover whether at that time defendant Konovsky, under color of his office and authority, willfully failed to disperse the crowd with the intention thereby to further a conspiracy to deprive Negro inhabitants of the right to enter. As we have said, the Government does not contend that this evidence indicated in any way that defendants were participating in the acts of the mob but does assert that the alleged willful failure of Konovsky to do his duty at the time was evidence of furtherance of the conspiracy. Consequently under the charge contained in Count 1, we think evidence of what occurred was material and relevant, at least in a reasonable quantity. However, the photographs reflecting acts of vandalism were highly inflammatory; we are of the opinion that their introduction was improper under the circumstances of this case. This was not a suit to recover damages. The only materiality of any evidence in this respect lay in its evidentiary value in determining whether defendants had willfully and intentionally failed to perform their duty. We think the photographs were of little or no aid in this respect and that, because of their inflammatory character, they should have been excluded. There was no dispute that a shocking riot had occurred and that serious damage had been done. Further than that inflammatory evidence of the acts of vandals was not material or

relevant to the question of whether either defendant willfully and intentionally failed to perform his duty. In this connection, we think also that whether Negroes had lived in the Town of Cicero in the past was wholly immaterial. The jury issue was not whether in times gone by Negroes had lived in Cicero but whether the alleged conspirators named in Count 1 had conspired, in the spring and summer of 1952, to prevent Negro inhabitants from enjoying property rights, intentionally and under color of law.

We do not intend to imply that each and every error which we have found to have occurred would, of itself, have amounted to reversible error, but, in view of our conclusions that the judgment must be reversed for a new trial, we have thought it well to consider each contention of the respective parties in order that the trial court may have the benefit, if any, of our thought with regard thereto. We should add that this record reflects a studious, careful attempt on the part of the trial court to afford all parties a fair and impartial trial. It is not surprising, perhaps, that in the course of a trial in which some 900 pages of testimony were taken and tense issues presented, in a sharply contested suit, despite the court's careful efforts, some rulings prejudicial to one or the other of the parties might creep in. Our conclusions, therefore, do not imply any criticism of the conduct of the trial judge in his carefully considered efforts to achieve a fair and impartial trial in an unusually difficult case.

What we have said with respect to the various facets of this litigation bear somewhat sharply upon the criticisms of the court's charge and its failure to give certain instructions. Perhaps the trial court unduly and at too great length charged the jury upon due process of law and the necessity of every citizen having his day in court, but, if so, this was due undoubtedly to the fact that the Government offered voluminous repetitious instructions in this respect. Some of them were eliminated, but there are more which we think might well have been refused.

In one instruction the court charged the jury that it was the mandatory duty of the municipal officers of Cicero to disperse any crowd of more than thirty persons, even though the crowd was not engaged in violence or rioting, if it appeared that there was reasonable cause to fear that the persons assembled would create a disturbance of the peace, yet the express provision of the statute is that it is the duty of the officers to go among the persons assembled, or as near to them as they can safely go, and to command the crowd to disperse and, if the persons assembled do not obey, to command the assistance of all persons present in arresting the persons unlawfully assembled. Thus the instruction placed upon the officer a greater duty than the statute prescribed and, in view of such a charge, the jury might easily have conceived the idea that it was the duty of the police to disperse the crowd regardless of danger to themselves and regardless of the extremity of methods which it might have been necessary to employ and that the mere inability of the officers to disperse the mob was itself a breach of the law. In this connection, it is well to observe that the police are not the only guardians of the peace. The sheriff and his force are likewise police officers. Consequently we believe that the court should have given the instruction requested by the defendants to that effect. See City of Chicago v. Chicago League Ball Club, 196 Ill. 54, 61, 63 N.E. 695.

However, we see no error in refusing to give an instruction which would have told the jury that if defendants Brani and Lange were acting only pursuant to orders from their superior, and not willfully, then they should be acquitted. The question was not merely whether they were acting in pursuance of their superiors but whether they willfully aided and abetted in the alleged deprivation of the rights of the Negro inhabitants. If a police officer acts intentionally under color of his office to subject a citizen to deprivation of his constitutional rights, he cannot justify his action in that respect by orders from his superiors. Of course he must have the

specific intent. But any instruction to the jury must carefully point out the distinction between the duty of an officer to allow his superior's instructions in the performance of his duty and the equal duty not to aid and abet in the deprivation of citizens' rights. The court should advise the jury clearly as to the duty of an officer in that respect as defined in Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495.

Inasmuch as the judgments must be reversed, we find it unnecessary to extend this opinion further. Accordingly the judgments are reversed with instructions to grant defendants a new trial.