THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee *v.* LUCAS E. CASTRO ANGUITA, Defendant and Appellant.

No. 15146. Argued August 26, 1952.—Decided December 30, 1953.

632

R. Rivera Zayas, Sergio G. Gelpí, Félix Ochoteco, Jr.; and Be-
nicio Sánchez Castaño, for appellant. José Trías Monge,
Attorney General (Víctor Gutiérrez Franqui, former Attor-
ney General, in the brief) and J. Rivera Barreras, Fiscal for
the Supreme Court, for appellee.

Mr. Chief Justice Snyder delivered the opinion of the
Court.

Lucas E. Castro Anguita, the defendant-appellant, was
charged jointly with Miguel Angel Palóu and Miguel Cirilo
Batalla in the former district court with eight offenses of
murder in the first degree and two offenses of attempt to kill.
The eight murder informations as well as the two informa-
tions for attempt to kill are identical except for the names

of the victims. At Castro's request, the lower court ordered that he be tried separately on the ten charges which by stipulation were tried together. The cases were tried before a jury which convicted Castro of all the charges. The lower court sentenced him to life imprisonment on each of the murder charges and from one to ten years on each of the charges of attempt to kill. He has appealed from the ten judgments, assigning eleven errors.

■■ The first error assigned is that the informations herein "do not contain sufficient elements in law to constitute the crimes of murder in the first degree and of attempt to kill charged in them." The defendant makes the same argument as to both types of charges. Consequently, to dispose of this error, we need discuss only the murder charges.

Each murder information charges that "...illegally, wilfully and criminally, with malice aforethought and deliberation, with a firm and determined intent and purpose to kill, demonstrating that they had abandoned and malignant hearts, the three defendants, acting by virtue of a common agreement among themselves, illegally killed [name of victim], in the perpetration by the said defendants of arson in the first degree, in the inhabited three-story building [description of building] then and there occupied by human beings on two of its floors and on the other floor by the Almacenes Palóu of the firm of Miguel A. Palóu & Cía., S. en C., the said fire having been conceived and planned by the three defendants among themeselves..."

The informations are based on §§ 199, 201 and 398 of the Penal Code, 1937 ed.[1] Murder in the first degree is charged here in that, as provided in § 201, it was allegedly "committed in the perpetration or attempt to perpetrate

---

[1] Section 199 provides that "Murder is the unlawful killing of a human being, with malice aforethought."

Section 201 reads as follows: "All murder which is perpetrated by means of poison, lying in wait, torture, or by any other kind of wilful, deliberate and premeditated killing, or which is committed in the perpe-

arson. . ." See *The People* v. *Alméstica*, 18 P.R.R. 314. The appellant contends that the informations are defective because they do not allege that in perpetrating arson the defendants did it with intent to destroy the building.

There are cases which hold that an information charging *arson* must allege that it was done with intent to destroy the building. 3 Burdick, *The Law of Crime*, pp. 7–8; 3 Cal. Jur. § 7, p. 167; *People* v. *Mooney*, 59 Pac. 761 (Cal., 1889). We assume we would apply the same rule in this jurisdiction. *Cf. People* v. *Pérez*, 35 P.R.R. 951. But this is a charge of murder in the first degree, not arson. And our attention has not been called to any case holding that an information for murder in the first degree based on a killing in the perpetration of arson must allege that the arson was committed with intent to destroy the building.

The defendant relies on the history in the United States of statutes similar to §§ 201 and 398. However, we find nothing in that history which requires us to agree with the defendant on this point. 2 Burdick, *supra*, pp. 178–80. We fail to see why the fact that the common law concept of arson has been somewhat changed by various statutes—*cf.* §§ 403, 405, 407 of the Penal Code—makes it necessary to allege the crime involved in this case in the language of § 398. The charge here is not for arson under § 398. It is for murder in the first degree under § 201. And the information not only charges a crime in the language of the latter but it also contains the specific facts which constitutes the charge. We therefore think the information states an offense under § 201 and that the first error was not committed. See *The People* v. *Calero et al.*, 18 P.R.R. 44; *People* v. *Matos et al.*, 26 P.R.R. 520; *People* v. *Burns*, 63 Cal. 614 (Cal.,

---

tration or attempt to perpetrate arson, rape, robbery, burglary or mayhem, is murder of the first degree, and all other kinds of murders are of the second degree."

Section 398 reads as follows: "Arson is the wilful and malicious burning of a building of another with intent to destroy it."

1883) ; *People* v. *Green*, 223 Pac. 1004 (Cal., 1924) ; *United States* v. *Debrow*, 346 U. S. 374.

■■ We turn to the eighth and ninth errors, which both parties have discussed together. In the eighth error Castro complains of the admission of testimony relating to the physical condition and flight of Batalla subsequent to the consummation of the alleged common design of the three defendants to set the fire. In the ninth error Castro contends that the trial court erred in instructing the jury— obviously referring to the flight of Batalla after the commission of the crime—that "the flight of a person immediately after commission of a crime, or after the crime has taken place of which the defendant is accused, is a circumstance which may be considered by a jury as showing a conscience not free of guilt, although the court instructs the jury that this fact is not itself sufficient to establish the guilt of the defendant."

These errors must be considered in the light of the circumstances of this case. We find it unnecessary for present purposes to summarize the voluminous record of the testimony adduced at the trial. It suffices to say that there was testimony from which the jury could reach the conclusions recited in the next five paragraphs.

A fire of incendiary origin occurred on the premises of Palóu & Co. before dawn on December 15, 1949. Late in the afternoon of December 14, 1949 Palóu and Batalla borrowed an automobile from a friend, allegedly for a sexual adventure. Immediately before the fire started, Palóu drove the said borrowed automobile slowly, looked up and down town, and then stopped approximately 30 feet beyond Almacenes Palóu. A minute and a half later a tremendous explosion was heard, starting the fire, which resulted in the deaths and injuries of persons living in the building. When the explosion occurred, neither Batalla nor Palóu was in their apartment.

Palóu was the managing partner of the firm Palóu & Co. Castro was a silent partner and creditor of the firm in the amounts of $6,000 and $19,413.67, respectively. The firm carried an insurance policy of $40,000 on its merchandise. The policy was renewed on September 9, 1949, three months before the fire. Castro obtained from the insurance company with Palóu's consent an indorsement of insurable interest which established a preference in his favor. Castro told the insurance agent when the policy was renewed that he would speak to Palóu to increase the policy in the amount of $15,000 to cover a prospective shipment of goods. The firm, which was established in 1944, made money during its first years, but from 1946 to December 14, 1949 lost $18,309.65. On the date of the fire the liabilities of the firm were $72,412.13, whereas the assets were only $69,326.05.

The accountant who kept the books for the firm saw Castro at Almacenes Palóu on two or three occasions. Palóu sent for the accountant on October 17, 1949 and thereafter Castro arrived. In Castro's presence some bills that had been received from New York were examined and the condition of the business was discussed by Palóu and the accountant.

Palóu was married to a niece-in-law of Castro. Batalla, a Cuban, lived at Palóu's apartment and passed himself off as the latter's brother-in-law. Castro came to *Almacenes Palóu* at times. Palóu, Castro and Batalla were seen talking in a small corridor in the rear of the warehouse on one occasion before the fire.

The chauffeur of the firm took Palóu in an automobile belonging to the firm to Castro's home on the morning of December 14, 1949. Later that afternoon the chauffeur drove Palóu and Batalla to a garage in the same car. The chauffeur went home at Palóu's direction, leaving the company car with the latter. Nobody has informed the insurance

company of the fire or made a claim for the insurance. On December 14, 1949 at 10 p. m. Batalla had no burns or injuries.

So far as Castro is concerned, the foregoing shows at the most motive and opportunity to plan the crime with the other defendants. Batalla had previously confessed to his part in setting the fire and had implicated both Castro and Palóu. *Castro* v. *González, Warden,* 70 P.R.R. 846. But that confession is not in this record. It was made after the arrest of Batalla and, so far as the latter was concerned, after the termination of the conspiracy or common design. It was clearly inadmissible against Castro; indeed, the government made no effort to introduce it in evidence.[2] Moreover, at the trial of the present case Batalla refused to testify on the ground that his case was pending in this Court and that his testimony would incriminate him. *Batalla* v. *District Court,* 74 P. R. R. 266. The case against Castro would therefore have been legally insufficient if the Commonwealth had not produced another witness.

Rosalí Miranda Colón, a travelling salesman for the firm of Palóu & Co., testified that on the day after the fire, on December 16, 1949 at 7 a.m., he went to the home of Castro because he needed some money for some purchases and he wanted, as an employee of Castro, to ask the latter for an advance which he would repay when the firm resumed its business. Castro invited him to his office, a converted garage at the rear of the house, where the witness requested and got $40 from Castro. At that time Castro said that "he felt distressed because of the misfortune which had taken place in the Almacenes Palóu" because he, Batalla and Palóu "did not think that if there were a fire so many deaths would occur." Castro also told him that Batalla and Palóu had come to his house weeks before the fire to confer with Cas-

---

[2] We cite later in this opinion the cases holding that such a confession by Batalla would be inadmissible against Castro.

tro "on the manner and time to accomplish the fire" in *Almacenes Palóu* at 300 Allen Street. Castro added that Batalla "was not in agreement on the matter of the fire"; that Batalla "was completely cowardly"; that then Castro had said, "But, Miguel, leave this man if he does not want to do that"; then, according to Castro, Palóu got up brusquely and left; and that Batalla then said goodbye to Castro and left too.

Rosalí Miranda further testified that Castro asked him if he had made a statement to the district attorneys. He answered that he had as to "some things." Castro then told him that if he were asked to testify again, "that I should take great care with what I testified so that I would not involve him in the fire" and that "anything they offer me I could count on his cooperation and that I could come to his house at any time." Their conversation lasted about fifteen minutes. The witness returned to Castro's house on December 26, 1949 for some more money and got $30.

The testimony of Rosalí Miranda is bitterly attacked in the defendant's brief as incredible and unworthy of belief. In addition, the defendant points to the following: (1) the witness did not mention these conversations with Castro in a previous sworn statement to the district attorney; (2) his testimony contains several contradictions; and (3) he testified as to a telephone call Castro allegedly made from the office-garage to obtain money for the witness on his second visit, whereas it was shown without question that there is no telephone in that place, although there is one in the house. However, we do not share the view of the defendant that under all the circumstances of this case we are required to reject completely the testimony of Rosalí Miranda as to the incriminating statements made to him by Castro.

With this background of the facts which are relevant to the questions before us, we proceed to a discussion of the eighth and ninth errors.

Acts and extra-judicial declarations of co-conspirators —or of co-defendants who commit a crime with a common design—are admissible in evidence against their fellow-defendants, provided (1) the record contains some independent evidence connecting the latter with the conspiracy or common design, and (2) the acts and statements of the co-conspirators occurred during the course and in furtherance of the conspiracy. *People* v. *González*, 61 P.R.R. 336; *People* v. *Berenguer*, 59 P.R.R. 79; *People* v. *López*, 42 P.R.R. 487; *The People* v. *Díaz et al*, 22 P.R.R. 177; *The People* v. *Beltrán et al.*, 18 P.R.R. 908; *Schine Theatres* v. *United States*, 334 U. S. 110, 117; *Glasser* v. *United States*, 315 U. S. 60, 74; *State* v. *Carbone*, 91 A. 2d. 571 (N. J., 1952); *United States* v. *Konovsky*, 202 F.2d 721, 727 (C.A. 7, 1953); Annotation, 93 L. ed. 802; IV Wigmore on *Evidence*, 3rd ed., pp. 127–131.[3]

As we have accepted, for present purposes, the testimony of Rosalí Miranda, we held that it was sufficient to fulfill the first requisite. The question remains, however, as to whether the testimony complained of in the eighth error also complies with the second condition. The testimony in question was as follows: A farmer testified that on the morning of December 18, 1949 he saw Batalla walking on the road near Sabana Grande and so advised the police who arrested Batalla. He identified in detail the clothing Batalla had worn that day and a screwdriver and some partly-used penicillin Batalla had with him. He also testified that Batalla had a scratch on his face, his right ear was burned, part of his skin was singed, and his right hand and right ankle were lacerated. A policeman corroborated the testimony of the

---

[3] According to Muñoz Amato, *The Hearsay Rule and its Exceptions in the Law of Puerto Rico*, 32 Calif. L. Rev. 31, 47 (English version), XIII *Rev. Jur. de la U.P.R.* 13, 32 (Spanish version), our cases in fact permit introduction in evidence of extra-judicial declarations concerning conspiracies and do not require that such declarations be made in furtherance of the conspiracy. On this point, see Morgan, *The Rationale of Vicarious Admissions*, 42 Harv. L. Rev. 461, 464–66; American Law Institute, *Model Code of Evidence*, Rule 508 (b), pp. 249–51.

farmer. A physician testified that he examined Batalla on December 18, 1949; that Batalla was unshaven and had second-degree burns and cuts on various parts of his body, including his hands; and that the hair on his skin had disappeared completely. He stated that this loss of hair on his skin was the result of high temperature produced by a fire; that the burns and small cuts which he observed on Batalla on December 18 were made not more than 5 nor less than 3 days prior thereto; and that Batalla had not shaved for 3 to 4 days. All of this testimony was admitted over the objection of Castro that it involved acts of Batalla subsequent to the commission of the crime.

Once Rosalí Miranda had connected Castro with the crimes charged herein, the trial court was correct in ruling that the testimony as to the physical condition in which Batalla was found, three days after the fire, was admissible in evidence against Castro. This is because it tended to show that Batalla had been burned and injured at the scene of the fire. And evidence that a co-defendant was injured in the course of carrying out a common design is admissible in evidence against the other defendants. *Lutwak* v. *United States*, 344 U. S. 604, 618; *Fitzpatrick* v. *United States*, 178 U. S. 304, 312–13; *Shelton* v. *State*, 126 So. 390, 394 (Miss., 1930); *Lancaster* v. *State*, 106 So. 609, 615 (Ala., 1925).

 If the evidence complained of in the eighth error had been confined to showing burns and injuries of Batalla on the theory that he had received them in setting the fire, we would find no error in its admission. But the testimony also showed that he was poorly dressed, was in a disheveled condition, had not shaved for at least three days, was trying to treat himself with penicillin, and was walking on the road near Sabana Grande. The purpose of this portion of the testimony apparently was to show that Batalla had fled after commission of the crime. This was certainly the understanding of the trial court: it instructed the jury in effect

that Batalla's flight was evidence of his guilt which in turn it could take into consideration in determining whether Castro was guilty. We must therefore determine if the flight of Batalla, under the circumstances disclosed by this record, was admissible in evidence against Castro.

A conspiracy to commit arson in order to collect insurance continues after the building is burned and includes efforts to collect the insurance. Consequently, act performed or statements made by one of the conspirators to collect such insurance would be admissible against his co-conspirators. *Commonwealth* v. *Girardot*, 163 Atl. 362 (Pa., 1932); *State* v. *Bersh*, 207 S. W. 809 (Mo., 1918); *Allen* v. *Commonwealth*, 196 S. W. 160, 165 (Ky., 1917); *Rawlings* v. *State*, 136 S.E. 448 (Ga., 1927). But Batalla's role in the common design, so far as the record shows, had been completed when the fire occurred. If collection of the insurance was to be effected, that had to be done by Palóu and Castro, the beneficiaries. We assume we would hold that the acts or statements of Batalla concerning the common design, even if they were not in furtherance of the conspiracy, would be admissible against Castro. See footnote 3. However, the apprehension of Batalla near Sabana Grande three days after the fire was not an act either in furtherance of or concerning the conspiracy. *Cf. State* v. *Violet*, 234 N.W. 623 (S.D., 1931); *Bollenbach* v. *United States*, 326 U.S. 607.

We do not hold that flight—or a plan therefor—can never be considered as part of a conspiracy or common design. Evidence was introduced in this very case that on December 14, 1949 Batalla made efforts to obtain a re-entry permit from the immigration authorities in contemplation of a trip to Cuba on December 20 for ten days. Such a plan, if deliberately made as part of the common design, would be admissible against the co-defendants. But here Batalla did not carry out any plan to flee to Cuba. And there is nothing in the record before us as to how he got to Sabana Grande.

Yet the inference which the jury was expected to draw—particularly in view of the instruction complained of in the ninth error—was that Batalla, panicky because of his burns and other unexpected events which had occurred at the fire, on his own initiative precipitately fled at some undetermined date after the fire.

For all the record shows, Batalla did not flee immediately after the fire. The evidence shows only that he was found near Sabana Grande three days after the fire. During the course of his instructions to the jury, the trial judge indicated that in his theory of the case the district attorney had stated that "...Batalla was left, injured [by Palóu] in a place near Santurce. That the former made a trip without a destination to the island until he was arrested in Sabana Grande days later." Undoubtedly, the district attorney had hoped to prove by testimony from Batalla himself that Batalla set the fire, assisted by Palóu; that the latter in a borrowed automobile drove Batalla, who had been burned and otherwise injured in setting the fire, away from the scene of the fire, dropping him in Santurce; that Batalla immediately fled to the island; and that, after wandering from one town to another, Batalla was arrested near Sabana Grande. But Batalla refused to testify. The record therefore contains nothing but the bare fact that Batalla was apprehended three days after the fire under circumstances indicating that at some point he had fled from San Juan.

If flight by Batalla immediately after the fire had been shown, it would perhaps have been so spontaneous an act or would have been an act so interwoven with the setting of the fire that, even though it continued for three days, it would be admissible in evidence against Castro. See *Cline* v. *State*, 148 So. 172 (Ala., 1933); *Cribble* v. *State*, 241 S.W. 158 (Tex., 1922); Underhill's *Criminal Evidence*, 4th ed., p. 1420; Annotation, 93 L.ed. 802, 803; *Acosta* v. *Crespo*, 70 P.R.R. 223, 240-1; *People* v. *Kauffman*, 92 Pac. 861 (Cal.,

1907); *People* v. *Cabaltero*, 87 P.2d 364 (Cal., 1959); Comments, 26 So. Calif.L.Rev. 64, 75; 40 Harv. L. Rev. 651; Notes, 75 U. of Pa. L. Rev. 361; Miller on *Criminal Law* 115. *Cf. State* v. *Dickerson*, 127 S.E. 256 (N.C., 1925); *People* v. *López, supra; People* v. *Philip*, 34 P.R.R. 619; *People* v. *Souffront*, 30 P.R.R. 101. But, without Batalla's confession or testimony, the record shows only his apprehension near Sabana Grande three days after the fire. Standing alone, that single piece of testimony does not bring his alleged flight within either the rule that it was a spontaneous act or the rule that it was intermingled with the crime itself.

■ Flight by a defendant, even if somewhat belated, constitutes evidence tending to show personal guilt. Annotation, 25 A.L.R. 886. But the mere flight of a defendant, after commission of a crime, unaccompanied by any other circumstances, ordinarily is not admissible against another defendant. *Lance* v. *State*, 142 S.E. 105 (Ga., 1928); *People* v. *Stanley*, 47 Cal. 113 (1874); *McKenzie* v. *State*, 25 S.W. 426 (Tex., 1894); *People* v. *Sharp*, 14 N.E. 319 (N. Y., 1887); *State* v. *Weaver*, 65 S.W. 308 (Mo., 1901); Underhill, *supra;* II Wigmore *on Evidence*, 3d ed., § 276 (4) pp. 111–6; IV *id.,* § 1052, p. 11. Such evidence is admissible if the latter defendant connived at the flight. II Wigmore, *supra*, p. 116. But, as already noted, there is no evidence of such connivance by Castro for the flight by Batalla to Sabana Grande.

■ Acts of a conspirator which took place after the conspiracy are admissible against the co-conspirators if they tend to confirm the facts of the conspiracy or demonstrate the intent of the conspirators. *Lutwak* v. *United States, supra*, 617; *United States* v. *Rubenstein*, 151 F.2d 915 (C. A. 2, 1945). But we find nothing in the bare fact of the apprehension of Batalla three days after the crime which establishes any of the facts of the conspiracy or the intent of the participants therein.

There are state cases which hold that there is implicit in every criminal conspiracy an agreement to conceal evidence and to prevent prosecution. Under those cases acts or statements of a co-conspirator made for such purposes, even subsequent to consummation of the crime, are admissible against the other defendants. *Pressley* v. *State*, 53 S.E.2d 106, 111 (Ga., 1949); *Cline* v. *State, supra; Allen* v. *Commonwealth, supra; People* v. *Suter*, 111 P.2d 23, 31 (Calif., 1941); *State* v. *Strait*, 279 S.W. 109, 114 (Mo., 1925); *Hooper* v. *State*, 58 S.W. 2d 434 (Ark., 1933); *State* v. *Emory*, 226 Pac. 754 (Kans., 1924); *Commonwealth* v. *Smith*, 24 N.E. 677 (Mass., 1890). The Supreme Court of the United States refused to follow these cases in *Krulewitch* v. *United States*, 336 U.S. 440. We need not determine in this case which rule we would adopt on this point as there was nothing in the fact of Batalla's apprehension near Sabana Grande which would bring his conduct within the rule laid down in the state cases. *Cf. Lutwak* v. *United States, supra.*[4]

■ Batalla's written, detailed confession implicating Castro was inadmissible in evidence against the latter, and the district attorney made no effort to introduce it in this case. "While the act of one partner in crime is admissible against the others where it is in furtherance of the criminal undertaking, *Pinkerton* v. *United States*, 328 U.S. 640, 646–647, and cases cited, all such responsibility is at an end when the conspiracy ends. *Logan* v. *United States*, 144 U.S. 263, 309; *Brown* v. *United States*, 150 U.S. 93, 98. Moreover, confession or admission by one co-conspirator after he has been apprehended is not in any sense a furtherance of the criminal enterprise. It is rather a frustration of it. . . .

---

[4] For discussions of the *Krulewitch* case as compared with the state cases, see 23 So. Calif. L. Rev. 102; 35 Va. L. Rev. 643.

The concurring opinion of Mr. Justice Jackson in the *Krulewitch* case describes the dangers lurking in a charge of conspiracy and the rules of evidence thereunder. On this same question, see Notes, 62 Harv. L. Rev. 276; 56 Yale L. J. 371.

So far as each conspirator who confessed was concerned, the plot was then terminated. He thereupon ceased to act in the role of a conspirator. His admissions were therefore not admissible against his erstwhile fellow-conspirators. *Gambino* v. *United States*, 108 F.2d 140, 142–143." *Fiswick* v. *United States*, 329 U.S. 211, 217; *People* v. *Colón*, 52 P.R.R. 399; *People* v. *Coto*, 48 P.R.R. 143; *United States* v. *Hall*, 178 F.2d 853 (C.A. 2, 1950); *State* v. *Violet, supra; State* v. *Frisby*, 204 S.W. 3 (Mo., 1918); IV Wigmore, *supra*, pp. 116–7; Annotation, 93 L.ed. 802. So far as the record before us shows, the flight by Batalla amounted at the most to conduct subsequent to the crime which was tantamount to an unspoken general confession of his personal guilt. Batalla's written confession implicating Castro was inadmissible against the latter. It clearly follows that Batalla's conduct amounting to a confession is equally inadmissible against Castro.

The ninth error, in which Castro complains of the instruction to the jury as to Batalla's flight, must be examined in the light of the eighth error. As we have seen, the testimony as to Batalla's burns and injury when apprehended was admissible against Castro. Consequently, admission of the additional testimony that Batalla was found under circumstances indicating flight might not in itself have been prejudicial. In fact, it might conceivably be considered as necessarily inseparable from the testimony as to Batalla's condition when arrested, making the entire testimony admissible as an integrated whole. See *Acosta* v. *Crespo, supra*, p. 240. But the error was not so much in the admission of this somewhat inconclusive evidence as to flight but rather in the instruction to the jury in effect that the flight of Batalla could be considered as evidence of the guilt of Castro.

As already noted, we have no quarrel with the doctrine that flight is some evidence of personal guilt and that a trial court should so instruct a jury. Also, as we have seen, the

flight of one conspirator is admissible against his co-conspirators if it (1) is a part of the common design, (2) is a spontaneous act immediately after the crime, (3) is an act intermingled with the crime, or (4) confirms the facts of the conspiracy or demonstrates the intent of the parties. But in the absence of all of these four factors, it is erroneous to instruct a jury that the flight of one defendant is evidence of the guilt of another defendant. As already pointed out, this is akin to the erroneous instruction that an extra-judicial confession after the crime by one defendant is evidence against the other defendant.

Counsel for Castro did not object specifically to the instruction now complained of in the ninth error.[5] However, he did object strenuously and in detail to admission in evidence of the flight of Batalla and his physical condition and appearance when arrested. Although not specifically objected to, the instruction as to flight aggravated the error in admitting the testimony in question to such an extent that the ordinary rule that the attention of the trial court must be called to allegedly erroneous instructions does not apply here. *People* v. *Belardo*, 50 P.R.R. 491; *People* v. *Agosto*, 50 P.R.R. 444; *People* v. *Serrano*, 35 P.R.R. 309; *People* v. *Sanjurjo*, 73 P.R.R. 526.[6]

---

[5] When the trial court finished its instruction to the jury, counsel for the defendant noted "a general exception to all the instructions and especially that which refers to arson and to the verdicts which could be rendered in those cases."

[6] The *Fiscal* of this Court understood the importance of injecting the flight of Batalla in the case against Castro. In discussing the contention of Castro that the *corpus delicti* was not established, he says the following in his brief: "An eloquent circumstance, showing that the criminal act of a person was involved in the fire, is the fact that Miguel Cirilo Batalla, who was passing as the brother-in-law of Miguel Palóu and lived in his house, and who took steps to leave Puerto Rico a few days after the fire and who accompanied Palóu to obtain the Oldsmobile automobile, license No. 3376 on December 13 and 14 ... appeared three days after the fire in a town far from San Juan, completely fatigued, unshaven, with numerous burns and his clothes slovenly, contrary to his previous appearance, carrying with him a bag containing among other things, clothing, a screwdriver and a tube of penicillin."

If the other evidence in the record were strong in implicating Castro, we might have held that the eighth and ninth errors were not prejudicial. But, aside from the testimony which established Castro's motive and opportunity, the only evidence linking Castro with the common design alleged here is the testimony of Rosalí Miranda as to Castro's incriminating statements to him. While we are not at liberty to reject Miranda's testimony as inherently incredible, we cannot say that it furnishes such a strong case against Castro that it precludes the possibility that the eighth and ninth errors were prejudicial. As the Supreme Court pointed out in *Krulewitch* v. *United States, supra,* p. 445, error is not harmless "if upon consideration of the record the court is left in grave doubt as to whether the error had substantial influence in bringing about a verdict." To the same effect, *Fiswick* v. *United States, supra,* p. 218; *Kotteakos* v. *United States,* 328 U. S. 750, 764–5; *Glasser* v. *United States, supra,* p. 67; *People* v. *Coto, supra; People* v. *Colón, supra,* p. 424; *The People* v. *Vázquez,* 20 P.R.R. 338, 346. As in the *Krulewitch* case, we cannot say that under the circumstances of this case the evidence of the flight of Batalla, coupled with the instruction that it could be considered as evidence of Castro's guilt, "may not have been the weight that tipped the scales against" Castro.

We said in the first sentence of *Batalla* v. *District Court, supra:* "This case has its roots in acts of abominable criminality which an offended society must repudiate with a righteous spirit of collective indignation." But in the next sentence we added: "However, the case herein involves the alleged violation of the fundamental rights of man in the basic guarantees established by laws which recognize those rights and under whose protection rests the incomparable magnificence of democracy in the free nations of the world." It is just as important that the trials of defendants charged with horrible crimes be free of prejudicial error as it is that

the true culprits be ultimately convicted and punished. We think under all the circumstances that in the interests of justice a new trial should be held for Castro in these cases.

The defendant has assigned a number of other errors. We think it unnecessary·to discuss them, except to state that we have examined them and have found that none of them requires his acquittal.

For the reasons stated, the judgments will be reversed and the cases remanded for a new trial.

Mr. Justice Ortiz did not participate herein.

———————

Mr. Justice Negrón Fernández, dissenting.

I am well aware of, and now ratify, the language and views which this Court copies at the end of its opinion in the instant case, citing from *Batalla* v. *District Court*, 74 P.R.R. 266. The incorrectness of the premise on which this Court bases the reversal of the judgments—notwithstanding the law is correctly stated in other respects—renders untenable the legal theory supporting the reversal.. The incorrect premise to which I refer is that the conspiracy between Castro, Palóu and Batalla ended, as respects the latter, with the fire.

Notwithstanding the fact that the evidence on Batalla's physical condition three days after the fire, relating to burns and injuries, was admissible because "it tended to prove that Batalla had received [such] burns and injuries at the scene of the fire," the conclusion is reached that the testimony to the effect that Batalla "was poorly dressed, in a disheveled condition, had not shaved for at least three days, was taking penicillin and was walking on the road near Sabana Grande," was inadmissible, inasmuch as "this part of the testimony evidently tended to prove that Batalla had run away after the commission of the crime," and that "Batalla's role in the common design, as far as the record discloses, had been completed when the fire·occurred"; that "if the

insurance was to be collected, that had to be done by Palóu and Castro, the beneficiaries," and that "Batalla's apprehension near Sabana Grande three days after the fire was not an act, either in furtherance of or concerning the conspiracy."

None of the cases cited by the Court in support of such conclusions, including *Krulewitch* v. *United States*, 336 U. S. 440, 93 L. Ed. 790, is applicable here, simply because the purpose of the conspiracy herein did not end with the fire. The common design was meant to defraud the insurance company through the destruction, by means of fire, of the insured merchandise. The fire was the means to an end. The purpose of the conspiracy was not achieved by the fire alone. It was necessary to hold secret the intentional character of the fire. There is no legal rule or case law which would grant or authorize protection to a co-conspirator against statements or acts of another co-conspirator where the objective of the common design is still under way, even though it may fail. I do not refer to Batalla's confession before the Prosecuting Attorney which was neither offered in evidence nor is involved in the instant case. I refer to the evidence found inadmissible by the Court, in that Batalla, upon arrest, "was poorly dressed, in a disheveled condition, had not shaved for at least three days, was taking penicillin and was walking on the road near Sabana Grande," which tended to establish Batalla's disappearance from the scene of the fire. In my opinion, that evidence was admissible since Batalla was not, up to that moment, a "confessed conspirator." He knew that the purpose of the conspiracy was not to kill by means of fire, or to destroy the building itself. It was to defraud the insurance company through the destruction of the insured merchandise by a fire which was supposedly casual. In strict law, his role of conspirator had certainly not terminated with the fire. His fleeing and hiding—without it being a common plan between him, Palóu and Castro—tended to avoid, or at least delay,

the discovery of the intentional character of the fire, and therefore enabled Palóu and Castro, if the fire was not discovered by other means, to achieve, or to take further action in order to achieve, their ultimate objective, which was to collect the insurance by fraud.

The Court correctly states the rule that a conspiracy to commit arson in order to collect insurance continues even after the fire and includes efforts to collect the insurance, see *State* v. *Bersch*, 207 S. W. 809, or until, once the intentional character of the fire is discovered, the conspiracy fails. Therefore, Batalla's role of co-conspirator subsisted notwithstanding the fact he had played his part in the conspiracy: the setting of the fire. The character and effect of a conspiracy is not to be judged by dismembering it and viewing its separate parts, but only by looking it as a whole. *United States* v. *Patten*, 226 U. S. 525, 57 L. Ed. 333. Batalla did not lose his character of conspirator by carrying out his part in the conspiracy, if the ultimate purpose of the latter had not as yet terminated. Castro, as co-conspirator, was responsible for all that was done by Batalla in the execution of the common design and for every act that might ensue incidentally as one of the probable and natural consequences of such execution, even though such consequences were not foreseen as part of the original plot. *Boyd* v. *United States*, 142 U. S. 450, 35 L. Ed. 1077.

Since the conspiracy had not terminated at the time of Batalla's arrest in Sabana Grande, the evidence which the Court finds inadmissible and which is treated as reversible error, was, in my opinion, properly admitted and, consequently, the challenged information was likewise correct. The case of *Krulewitch* v. *United States, supra*, decides nothing against the foregoing, for in that case the conspiracy had terminated. Evidently, the legal principles and precedents applied by the Court are fundamentally correct if we were dealing with acts occurring after the termination of

a conspiracy, to a situation of facts and of law different from that announced in the authorities. cited in the opinion.

Without examining the other assignments made by appellant, I dissent from the majority on the particular ground leading to reversal.